NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARLON E. BRADSHAW, SR., |  |
| Plaintiff, |  |
| v. | Civil Action No. 18-14089 (RK) (JBD) |
| STATE OF NEW JERSEY et al., | **OPINION** |
| Defendants. |  |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon the Motion for Summary Judgment ("Motion") brought by Defendants Drs. Douglas Leonard, D.O., Ihuoma Nwachukwu, M.D., Geetha Hrishikesan, M.D., and Edith Senyumba, M.D. ("Defendants"). ("MSJ," ECF No. 155.) Through counsel, Plaintiff Marlon E. Bradshaw, Sr. ("Mr. Bradshaw" or "Plaintiff"), a state prisoner incarcerated at New Jersey State Prison ("NJSP"), opposed the motion ("Opp.," ECF No. 158), and Defendants replied ("Reply," ECF No. 160). In support of their Motion and in accordance with Local Civil Rule 56.1(a), Defendants filed a Statement of Material Facts ("D-SOF," ECF No. 155-3), to which Plaintiff filed a response, ("Resp. to D-SOF," ECF No. 158-9). Plaintiff also filed a Supplemental Statement of Material Facts, ("P-SSOF," ECF No. 158-10), to which Defendants filed a Response, ("Resp. to P-SSOF," ECF No. 161). The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons below, Defendants' Motion for Summary Judgment is **GRANTED**.

# I.    **BACKGROUND**

## A.    PROCEDURAL BACKGROUND

On September 24, 2018, Plaintiff, then proceeding *pro se*, filed suit against Dr. Douglas Leonard ("Dr. Leonard"), Dr. Ihuoma Nwachukwu ("Dr. Nwachukwu"), and Dr. Geetha Hrishikesan ("Dr. Hrishikesan"), among other individuals and entities, alleging inadequate medical care in violation of the Eighth Amendment. (ECF No. 1.) On May 26, 2020, *pro bono* counsel was appointed for Plaintiff.[1] (ECF Nos. 54, 55; *see also* ECF Nos. 53, 66.) A scheduling order was entered, (ECF No. 61), and subsequently extended several times, (ECF Nos. 84, 104, 110, 114). On July 7, 2022, Plaintiff, through that counsel, filed an Amended Complaint adding Dr. Edith Senyumba ("Dr. Senyumba") as a defendant. ("AC," ECF No. 89.) All four Defendants, represented by the same counsel, filed answers to the Amended Complaint.[2] (ECF No. 90 (July 22, 2022, answer by Drs. Leonard, Nwachukwu, and Hrishikesan); ECF No. 108 (December 27, 2022, answer by Dr. Senyumba).)

Relevant here, discovery began in September 2020 (after *pro bono* counsel had already been appointed for Plaintiff) and ended in May 2023. (ECF Nos. 61, 114.) Plaintiff's deadline to identify any affirmative experts, initially sometime in early 2021, (ECF No. 61), was continued to October 2022, (ECF No. 84), then early 2023, (ECF Nos. 104, 110), then finally May 22, 2023,

---

[1] The Court notes that Mr. Bradshaw has had the benefit of highly experienced, skilled *pro bono* counsel for nearly six years. Among other things, on behalf of Plaintiff, *pro bono* counsel participated in innumerable teleconferences, (*e.g.*, ECF Nos. 57, 60, 61, 63, 65, 67, 70, 82, 84, 86, 101, 104, 111, 119, 123, 138, 141, 145), and almost annual settlement conferences, (ECF Nos. 71, 73, 81, 114; *see also* ECF No. 74). The Court extends its sincere gratitude—"[l]awyers who act *pro bono* fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession." *Houser v. Folino*, 927 F.3d 693, 697 n.1 (3d Cir. 2019).

[2] In his Amended Complaint, Plaintiff also added Eighth Amendment inadequate care claims against a fifth physician, Dr. Ashraf E. Haggag, M.D. That defendant was represented by different counsel. The Court recently granted summary judgment in Dr. Haggag's favor such that only the four instant physician defendants remain. (ECF Nos. 164, 165.)

(ECF No. 114).[3] Plaintiff identified no experts. On July 21, 2025, Defendants moved for summary judgment. (MSJ.)

## B. FACTUAL BACKGROUND[4]

On or around January 19, 2017, Mr. Bradshaw was transferred to NJSP from another facility. (Med. Rec. at D2914; *see* Pl. Dep. 47:20–21.) He began receiving medical treatment from Defendants, among other healthcare providers, for various preexisting conditions, including anxiety, arthritis, degenerative disc disease, high blood pressure, and peripheral artery disease. (Pl. Dep. 7:18–8:5; Med. Rec. at D2915–D2916.)

### 1. Defendant Dr. Leonard

During the relevant period, Mr. Bradshaw was placed on NJSP's "Mental Health Special Needs Roster," which made him eligible to receive mental health treatment. (D-SOF ¶¶ 20–21; Resp. to D-SOF ¶¶ 20–21; *see* Med. Rec. at D2916.) On October 9, 2017, Mr. Bradshaw had an appointment with one of his mental health providers, Dr. Leonard. (D-SOF ¶ 3; Resp. to D-SOF ¶ 3; Med. Rec. at D2913.) Mr. Bradshaw was at that time taking two medications for anxiety, both prescribed by Dr. Leonard: Effexor and Buspar. (Dr. Leonard Dep. 17:22–25, 18:18–19:5; *see* Pl. Dep. 60:13–17; Med. Rec. at D2914–D2915.) Dr. Leonard prescribed a new medication,

---

[3] On May 15, 2023, this case was reassigned from the Honorable Michael A. Shipp, U.S.D.J., to the undersigned. (ECF No. 115.)

[4] In support of their Motion, Defendants filed Mr. Bradshaw's excerpted medical record, which the Court will cite based on the Bates numbering therein, with the initial "0s" omitted. (*See* "Med. Rec.," ECF No. 156 (sealed).) In support of his response brief, Mr. Bradshaw filed the transcripts of his own deposition and those of Drs. Leonard, Hrishikesan, and Senyumba. ("Pl. Dep.," ECF No. 158-2; "Dr. Leonard Dep.," ECF No. 158-5; "Dr. Hrishikesan Dep.," ECF No. 158-4; "Dr. Senyumba Dep.," ECF No. 158-3.) Dr. Nwachukwu was also deposed; Defendants attached to their Motion the two pages of her deposition they cited, ("Dr. Nwachukwu Dep.," ECF No. 155-1), and Mr. Bradshaw did not file any additional pages.

Trazodone,[5] to help with Mr. Bradshaw's anxiety and trouble sleeping. (D-SOF ¶ 3; Resp. to D-SOF ¶ 3; *see* Pl. Dep. 44:1–9; Dr. Leonard Dep. 19:6–13.) Dr. Leonard also ordered the discontinuation of Effexor and Buspar, according to his contemporaneous chart note from the October 9 appointment. (D-SOF ¶ 5 (citing Med. Rec. at D2917).) All three medications, however, continued to be given to Mr. Bradshaw. (Pl. Dep. 51:1–7.)

Seven days later, on October 16, 2017, Mr. Bradshaw reportedly experienced elevated blood pressure and swelling in his face and legs. (D-SOF ¶ 6; Resp. to D-SOF ¶ 6; Pl. Dep. 41:23–24.) He attributed the reaction to the Trazodone and/or Trazodone's interaction with Effexor and Buspar. (*See, e.g.*, Opp. at 10 (asserting that Mr. Bradshaw "had a severe reaction to . . . Trazadone," then referencing "potential adverse reaction" between Trazodone, Effexor, and Buspar); *see also* Resp. to D-SOF ¶ 4 (referencing potential adverse interaction between Trazodone and Effexor); Resp. to D-SOF ¶ 6 (referencing Mr. Bradshaw's "reaction to the Trazadone"); P-SSOF ¶ 4 (same).) According to Dr. Leonard, when Trazodone and Effexor are taken together, "there is a serotonin syndrome that can occur. It's rare, but it is a potential. And with that, there can be elevations in the blood pressure and cardiac effects because of that." (Dr. Leonard Dep. 29:22–25; *see also id.* 25:2–15 (testifying that elevated blood pressure is a "more typical" adverse interaction reaction than "severe swelling in the limbs"); Resp. to D-SOF ¶ 9.) Mr. Bradshaw was treated for the reaction and given a medication that successfully lowered his blood pressure. (D-SOF ¶ 7; Resp. to D-SOF ¶ 7; *see* Pl. Dep. 41:25–42:6.) The next day, October 17, 2017, Dr. Leonard discontinued the Trazodone. (D-SOF ¶ 8; Resp. to D-SOF ¶ 8.)

---

[5] Because the parties sometimes refer to this medication as "Trazadone," that spelling appears in some direct quotations in this Opinion. When not directly quoting the parties, however, the Court uses the spelling "Trazodone," which appears to be the correct spelling for the medication.

Mr. Bradshaw continued taking Effexor and Buspar. However, his insomnia persisted, and he believed "one or both of those drugs" was the cause. (Pl. Dep. 22:25–23:2.) On Wednesday, February 14, 2018, he submitted a request via the NJSP messaging portal asking that Dr. Leonard discontinue Buspar and wean him off Effexor. (D-SOF ¶ 10; Resp. to D-SOF ¶ 10.) A clinic employee responded on Friday, February 16 that she would "pass [Mr. Bradshaw's] message on to Dr. Leonard who will be here Monday." (Med. Rec. at D5056.) That evening, Mr. Bradshaw "refuse[d] to take his p.m. psych med," i.e., Effexor. (*Id.* at D251; D-SOF ¶ 12; *see* Resp. to D-SOF ¶ 12 (citing Pl. Dep. 23:12–24:20).)

On Tuesday, February 20, Dr. Leonard obliged Mr. Bradshaw's discontinuation request as to Buspar. (D-SOF ¶ 11 (citing Med. Rec. at D2864–D2865).)[6] In a chart note associated with Mr. Bradshaw's message request, Dr. Leonard wrote, "P[a]t[ient] has been complaining again about lack of sleep and has requested to come off of the Buspar . . . . Will discontinue that now. Will need to speak again with p[a]t[ient] and consider sleep study as several trials of various agents unsuccessful." (Med. Rec. at D2864.)

That week and the next, on February 25 and March 4, 2018, Mr. Bradshaw again refused to take his Effexor. (D-SOF ¶ 12; Resp. to D-SOF ¶ 12.) He explains that he was frightened after a nurse twice brought him the wrong medication, and he wanted relief from his insomnia.[7] (Resp. to D-SOF ¶¶ 12–13; Pl. Dep. 58:14–20; Med. Rec. at D5061.) Mr. Bradshaw experienced

---

[6] Mr. Bradshaw does not appear to dispute that Buspar was discontinued at his request in February 2018 and makes no claims about the discontinuation of Buspar, only about Effexor. (*See* Resp. to D-SOF ¶ 11 (citing Mr. Bradshaw's deposition testimony that Buspar and Effexor were not stopped when Trazodone was prescribed in October 2017 and not addressing what happened in February 2018); Opp. at 10–12).)

[7] Mr. Bradshaw testified that he obtained copies of the "medication administration record" associated with the wrong medication he was given but that "that particular medication record for the whole month" was blank. (Pl. Dep. 38:14–15, 38:22–25; *see* Resp. to D-SOF ¶ 76.) On this basis, he claims that "Defendants are . . . liable for the falsification or destruction of [his] medical records regarding psychoactive medications." (Opp. at 16; *see* AC ¶ 15.)

headaches and stomach cramps during that two-week period, which he characterizes as symptoms of withdrawal from Effexor. (Resp. to D-SOF ¶ 10 (citing Pl. Dep. 61:15–19).)

On March 5, 2018, Dr. Leonard discontinued Mr. Bradshaw's Effexor. (D-SOF ¶¶ 14–15; Med. Rec. at D2860; *see* Resp. to D-SOF ¶¶ 15–16.) Mr. Bradshaw was advised via the messaging portal that Dr. Leonard had discontinued the medication because Mr. Bradshaw was "refusing to take it" and that Dr. Leonard "is trying to get some medical input – to see if there is anything more that can be done." (Med. Rec. at D5061; *see* D-SOF ¶ 15; Resp. to D-SOF ¶ 15.) The clinic staff person added, "[Dr. Leonard] will keep you advised. You have to understand – trying to arrange this does not happen quickly." (Med. Rec. at D5061.) Mr. Bradshaw responded, "I don't take issue with the discontinuation of the Effexor; that is what I wanted but I asked to be weaned as recommended so that I would not suffer such intense withdrawal symptoms." (Resp. to D-SOF ¶ 16 (emphasis omitted) (quoting Med. Rec. at D5061).)

On March 20, 2018, Dr. Leonard attempted to have a follow-up appointment with Mr. Bradshaw, but Mr. Bradshaw "refused to speak with Dr. Leonard," (D-SOF ¶ 19 (citing Med. Rec. at D2850); *see* Resp. to D-SOF ¶ 19), and "essentially fired [him]," (Resp. to D-SOF ¶ 19 (quoting Dr. Leonard Dep. 30:16)). Mr. Bradshaw soon asked to be removed from the Mental Health Special Needs Roster—that is, to stop receiving treatment from Dr. Leonard or any other mental health provider—"based on the reaction to Trazadone and Dr. Leonard's refusal to see [him] after such reaction." (Resp. to D-SOF ¶ 22 (citing Pl. Dep. 22:6–16); *see* D-SOF ¶ 22.) Dr. Leonard attempted to see Mr. Bradshaw again on April 16, 2018, but Mr. Bradshaw again would not speak to him. (D-SOF ¶ 19 (citing Med. Rec. at D2841); *see* Resp. to D-SOF ¶ 19.) "On or about April 26, 2018 Plaintiff's treatment team granted Plaintiff's request to be removed from the [Mental Health Special Needs] Roster, noting that Plaintiff had been off of his medication for one month,

6

and reported being asymptomatic, and feeling better without medication." (D-SOF ¶ 24; Resp. to D-SOF ¶ 24.)

Based on these facts, Mr. Bradshaw claims that Dr. Leonard was deliberately indifferent to his serious medical needs by prescribing Trazodone, failing to wean him off Effexor, and inadequately treating his insomnia. (*See* AC ¶¶ 16–19; Opp. at 10–12.)

### 2.    Defendants Drs. Nwachukwu, Hrishikesan, and Senyumba

For his physical conditions—as relevant here, arthritis, degenerative disc disease, related spine and back pain, high blood pressure, and peripheral artery disease—Mr. Bradshaw saw Drs. Nwachukwu, Hrishikesan, and Senyumba, among other non-party physicians. Each physician was employed by Rutgers, the State University of New Jersey, during the period at issue, (*see* ECF No. 90 ¶¶ 4, 7–8; ECF No. 108 ¶ 9), with Dr. Nwachukwu serving as the Medical Supervisor in charge of NJSP's medical clinic, (Resp. to D-SOF ¶ 33; *see also* Dr. Hrishikesan Dep. 23:19).

### a.    *Spine Pain*

For several years before his January 19, 2017, transfer to NJSP, Mr. Bradshaw was taking Celebrex for back pain. (Med. Rec. at D234–D235, D2914; *see* Pl. Dep. 47:20–21; AC ¶ 21.) Within a week of the transfer, he was given a one-year Celebrex prescription. (D-SOF ¶ 25 (citing Med. Rec. at D420); Resp. to D-SOF ¶ 25.) On March 23, 2018, after the prescription ran out, Mr. Bradshaw requested a prescription renewal at the clinic. (D-SOF ¶ 26; Resp. to D-SOF ¶ 26; *see* Med. Rec. at D234–D235.) A non-party physician explained to Mr. Bradshaw "the side effects of Celebrex, including cardiac and gastrointestinal effects," and ordered a two-week Celebrex prescription. (D-SOF ¶ 30; Resp. to D-SOF ¶ 30; *see* D-SOF ¶¶ 27–28; Med. Rec. at D233, D235.) Dr. Nwachukwu approved the two-week prescription later the same day. (D-SOF ¶ 27; Resp. to D-SOF ¶ 27; *see* Med. Rec. at D232, D234.) She did so in her capacity as the NJSP clinic

supervisor, not as Mr. Bradshaw's treating physician or prescriber. (*See* D-SOF ¶ 28; Resp. to D-SOF ¶ 28; Med. Rec. at D232.) Although she later had two visits with Mr. Bradshaw, unrelated to the Celebrex prescription or his other allegations against her here, Dr. Nwachukwu had not had any appointments with Mr. Bradshaw as of March 2018, per Mr. Bradshaw's deposition testimony. (Pl. Dep. 25:3–18; *see* D-SOF ¶ 33; Resp. to D-SOF ¶ 33.)

Mr. Bradshaw sought another renewal of his Celebrex prescription on June 27, 2018, during an appointment with Dr. Hrishikesan. (D-SOF ¶ 31; Resp. to D-SOF ¶ 31.) As detailed below, this was not Mr. Bradshaw's first appointment with Dr. Hrishikesan, but it was the first appointment at which he brought up his pain and Celebrex prescription. Dr. Hrishikesan wrote in her chart note that Mr. Bradshaw reported joint and back pain and "was taking [C]elebrex – in past." (Med. Rec. at D182.) She "discussed with Plaintiff the dangers of the long-term use of nonsteroidal anti-inflammatory drugs such as Celebrex and noted that continued use of same is contraindicated due to Plaintiff's coronary artery disease. Plaintiff already knew of these side effects."[8] (D-SOF ¶ 31; Resp. to D-SOF ¶ 31; *see* D-SOF ¶ 47; Resp. to D-SOF ¶ 47; Pl. Dep. 74:15–18.) She did not prescribe Celebrex for Mr. Bradshaw but increased his Motrin dosage and discussed that he could take Tylenol as needed. (Med. Rec. at D182; *see* D-SOF ¶ 47; Resp. to D-SOF ¶ 47.) Dr. Hrishikesan also recorded the results of recent imaging, including, on May 17, 2018, "modest degenerative changes" such that Mr. Bradshaw would soon be "going for [an] MRI [of his] neck." (Med. Rec. at D182 (also noting "4/2018 left hip xray normal," "Xray taken 6/14/2018 left shoulder normal," and "[l]eft hand xray normal").)

---

[8] Mr. Bradshaw "[a]dmitted" this statement of fact by Defendants, (Resp. to D-SOF ¶¶ 31, 47; *see also id.* ¶ 30), yet asserts in his response brief that he does not recall such a conversation occurring, (Resp. at 13 (citing Pl. Dep. 75:4–9)). Even if the Court were to consider this a disputed fact despite Mr. Bradshaw's admission, *but see* L. Civ. R. 56.1(a), it would not affect the Court's analysis, as the occurrence of any such conversation is immaterial for the reasons explained below.

In August of 2018, Mr. Bradshaw "suffered from intense lower back pain every day to the point where he could not stand up or use his back muscles in the lower part of his spine; he relied on his arms to get out of bed, and could not lift 15-20 pounds without his back giving out." (P-SSOF ¶ 8 (citing Pl. Dep. 81:3–23); *see* Resp. to P-SSOF ¶ 8.) Plaintiff testified in his deposition that he had been "told by [clinic] staff" around May of 2018 that Dr. Nwachukwu approved him for an MRI of his lumbar (lower) spine. (Resp. to D-SOF ¶ 33 (citing Pl. Dep. 85:2–21); *see* AC ¶ 22.) He did not receive that MRI "until years later." (P-SSOF ¶ 8.) Instead, at the time, he received the above-mentioned X-rays, (Med. Rec. at D182), and on August 2, 2018, he received an MRI of his cervical (upper) spine, (*id.* at D168–D169; *see* Pl. Dep. 80:14–21).

On August 8, six days after his cervical spine MRI, Mr. Bradshaw had an appointment with Dr. Senyumba, during which she went over the results: "[m]ultilevel degenerative changes within the cervical spine." (Med. Rec. at D166; *see* D-SOF ¶ 57; Resp. to D-SOF ¶ 57.) Mr. Bradshaw told Dr. Senyumba that "actually . . . his main problem is the lower back and not the [cervical] spine . . . and [he] wants attention and medication for it." (Med. Rec. at D166; *see id.* ("P[a]t[ient] says though he has arthritis in elbow and shoulder his main problem is in his lower back . . . ."); D-SOF ¶ 58; Resp. to D-SOF ¶ 58.) Dr. Senyumba prescribed Tylenol and determined "[i]t was not appropriate at that time" to order another spine MRI because Mr. Bradshaw "needed to take [the Tylenol] and see whether that would help." (Dr. Senyumba Dep. 17:21–18:1; *see* D-SOF ¶ 58; Resp. to D-SOF ¶ 58.) Dr. Senyumba "made a note for Plaintiff to return for a follow-up visit to discuss his lower back," (D-SOF ¶ 58), but it appears that was her last appointment with Mr. Bradshaw, (*see id.* ¶¶ 57–58; Resp. to D-SOF ¶ 58). Dr. Senyumba testified that she did not recall whether Tylenol helped Mr. Bradshaw's reported lower back pain "because [she] didn't follow

him a long time" and she relocated from NJSP to a different facility before long. (Dr. Senyumba Dep. 18:4–5; *see id.* 18:8–12, 32:7–17.)

Based on these facts, Mr. Bradshaw claims that Drs. Nwachukwu, Hrishikesan, and Senyumba did not do enough to treat his reported pain, including that Dr. Nwachukwu should have renewed his Celebrex prescription and all three should have ordered him a lumbar spine MRI. (AC ¶¶ 20–23, 25–26; Opp. at 12–15.)

    b.    *Blood Pressure and Peripheral Artery Disease*

Dr. Hrishikesan's initial visit with Mr. Bradshaw was on April 4, 2018, to address swelling in his lower legs. (D-SOF ¶¶ 37, 40; Resp. to D-SOF ¶¶ 37, 40.) Shortly before that appointment, Mr. Bradshaw's blood pressure medication had been changed to Norvasc, and Dr. Hrishikesan believed that could have been the cause of his lower leg swelling. (Med. Rec. at D227–D228; *see id.* at D235; D-SOF ¶ 37; Resp. to D-SOF ¶ 37.) She replaced the Norvasc with a different blood pressure medication, Hydrochlorothiazide, and increased the dosage for a blood pressure medication he was already taking, Coreg. (Med. Rec. at D228; *see* D-SOF ¶ 38; Resp. to D-SOF ¶ 38.) She also ordered a cardiology consult with an outside, i.e., non-prison, physician, along with several tests, including a comprehensive metabolic panel, echocardiogram, and EKG. (D-SOF ¶¶ 39–40; Resp. to D-SOF ¶¶ 39–40.) Mr. Bradshaw received the EKG the next day, April 5, (D-SOF ¶ 41; Resp. to D-SOF ¶ 41), and the echocardiogram later that month, (*see* Med. Rec. at D209 (April 30, 2018, medical record entry by Dr. Hrishikesan noting that earlier-ordered echocardiogram was "normal")).

On April 18, 2018, two weeks after their initial appointment, Dr. Hrishikesan and Mr. Bradshaw had a second visit to follow up on his lower leg swelling. (D-SOF ¶ 42; Resp. to D-SOF ¶ 42.) Dr. Hrishikesan recorded in her chart note that Mr. Bradshaw no longer had any swelling,

per her observations and Mr. Bradshaw's self-reporting, and that Mr. Bradshaw's blood pressure was "well controlled – 122/88." (Med. Rec. at D215; *see* D-SOF ¶ 43; Resp. to D-SOF ¶ 43.) She noted Mr. Bradshaw "will be seeing [the] cardiologist" for the consultation she had ordered at the previous appointment, (Med. Rec. at D215), and she ordered an ultrasound, which Mr. Bradshaw received the next week, (D-SOF ¶ 44; Resp. to D-SOF ¶ 44). On May 8, she refilled Mr. Bradshaw's blood pressure medications. (D-SOF ¶ 45; Resp. to D-SOF ¶ 45.) On June 27, Dr. Hrishikesan had a third appointment with Mr. Bradshaw.[9] (D-SOF ¶ 46, Resp. to D-SOF ¶ 46.) She noted his hypertension was stable on the increased blood pressure medication and the new medication she previously added. (Med. Rec. at D182; *see* D-SOF ¶ 48, Resp. to D-SOF ¶ 48.)

On July 11, 2018, Mr. Bradshaw had a telemedicine consultation with the outside cardiologist per Dr. Hrishikesan's orders, and the cardiologist recommended additions and changes to Mr. Bradshaw's medications plus various tests, all of which Dr. Hrishikesan ordered. (D-SOF ¶¶ 50–52; Resp. to D-SOF ¶¶ 50–52.) On September 12, Mr. Bradshaw had a second cardiology visit, after which Dr. Hrishikesan ordered a third. (D-SOF ¶¶ 53, 55; Resp. to D-SOF ¶¶ 53, 55.) She also ordered a CT angiogram and metabolic panel. (D-SOF ¶ 55; Resp. to D-SOF ¶ 55.)

It is unclear how long, if at all, Dr. Hrishikesan continued treating or seeing Mr. Bradshaw thereafter. (*See, e.g.*, Dr. Hrishikesan Dep. 13:12–14 (testifying that she had three total appointments with Mr. Bradshaw); AC ¶ 24 (alleging that they had four total appointments).) It is undisputed that she worked at NJSP for approximately nine months in 2018. (D-SOF ¶ 36; Resp. to D-SOF ¶ 36.)

Based on these facts, Mr. Bradshaw claims, at least nominally, that Dr. Hrishikesan "fail[ed] to provide any necessary medication or treatment for [his] stenosis, despite multiple visits

---

[9] This was the appointment, discussed above, at which Mr. Bradshaw requested a Celebrex refill.

related thereto." (Opp. at 14; *see also* AC ¶ 24 ("Plaintiff has been diagnosed with stenosis in the arteries of both legs which adversely affects blood circulation.").)

Mr. Bradshaw's third telemedicine appointment with the outside cardiologist was on February 22, 2019. (Med. Rec. at D94–D95; D-SOF ¶¶ 56, 59; Resp. to D-SOF ¶¶ 56, 59.) At that appointment, the cardiologist made two recommendations relevant here: "[a]dd Xarelto 2.5 mg twice a day" to treat Mr. Bradshaw's peripheral vascular disease and "consider getting a venous ultrasound." (Med. Rec. at D95; *see* D-SOF ¶¶ 59, 73; Resp. to D-SOF ¶¶ 59, 73.) Not much can be said about the venous ultrasound recommendation. The only relevant factual allegations, both of which are undisputed, are that the ultrasound was recommended by the outside cardiologist on February 22, 2019, and received by Mr. Bradshaw on March 26, 2019. (D-SOF ¶¶ 73–74; Resp. to D-SOF ¶¶ 73–74.)

The Xarelto recommendation was approved by Dr. Nwachukwu on February 26, 2019, four days after Mr. Bradshaw's cardiology appointment. (D-SOF ¶¶ 56, 60–61; Resp. to D-SOF ¶¶ 56, 60–61.) A non-party NJSP physician submitted the associated Non-Formulary Drug Request Form the same day. (D-SOF ¶ 60; Resp. to D-SOF ¶ 60.) The next day, February 27, the same non-party physician prescribed Xarelto, and it was added to Mr. Bradshaw's medication list. (D-SOF ¶ 62; Resp. to D-SOF ¶ 62.) It is unclear whether the same non-party physician discontinued Mr. Bradshaw's Xarelto prescription days later, on March 1, 2019.[10] (*See* D-SOF ¶ 63; Resp. to D-SOF ¶ 63.) Either way, it is undisputed that, on May 22, 2019, the outside

---

[10] Defendants assert that the same NJSP physician who submitted the Non-Formulary Drug Request Form and prescribed Xarelto ordered that the prescription be discontinued on March 1, 2019. (D-SOF ¶ 63.) Mr. Bradshaw responds that "he was taking Xarelto until October 2020 when [the outside cardiologist] determined it was no longer necessary." (Resp. to D-SOF ¶ 63 (citing Pl. Dep. 107:6–14).) Yet he also claims that his "reception of Xarelto was delayed three or four months from the time of prescription" because of Dr. Senyumba. (P-SSOF ¶ 7 (citing Pl. Dep. 34:7–13).) For the reasons discussed below, none of these assertions create a material factual dispute or defeat summary judgment.

cardiologist recommended three months of Xarelto, and the medication was prescribed by the non-party NJSP physician two days later. (D-SOF ¶¶ 64–65; Resp. to D-SOF ¶¶ 64–65.) It is likewise undisputed that Xarelto continued to be approved and prescribed for Mr. Bradshaw without any involvement by Defendants and that Mr. Bradshaw continued to receive the medication until October 1, 2020, when it was discontinued by the outside cardiologist. (D-SOF ¶¶ 67–71; Resp. to D-SOF ¶¶ 67–71.)

Based on these facts, Mr. Bradshaw claims, also nominally, that Dr. Senyumba ignored the outside cardiologist's Xarelto and venous ultrasound recommendations.[11] (AC ¶ 27; Opp. at 15.)

c.    *Hepatitis C*

One final detail is relevant about Dr. Hrishikesan's third appointment with Mr. Bradshaw on June 27, 2018. At that appointment, Mr. Bradshaw requested treatment for his hepatitis C. (Med. Rec. at D182.) It is undisputed that Mr. Bradshaw has a history of hepatitis C, although the record—and indeed Mr. Bradshaw—is silent as to what effect, if any, that had on him during the relevant period, including his reasons for requesting treatment at that time. (*See, e.g.*, Med. Rec. at D184 (conditions list).) In her chart note, Dr. Hrishikesan noted that Mr. Bradshaw's "APRI score" was low, and she ordered additional related testing, including a test of his viral load as well as an infectious disease consult.[12] (*See* Med. Rec. at D178–D187; D-SOF ¶¶ 48–49.)

---

[11] In addition to his claim against Dr. Senyumba concerning his Xarelto prescription, Mr. Bradshaw brings a general claim that "there is a constant delay between [his] completion of a 30-day supply of medication and the refilling of such medication, sometimes up to three weeks." (Opp. at 16 (citing Pl. Dep. 120:15–22); *see* P-SSOF ¶ 11.) As explained below, *see infra* Section III.D, this claim is untethered to any specific factual allegations and is seemingly brought against all Defendants or against no Defendant in particular.

[12] Mr. Bradshaw purports to contest these factual statements, but for the reasons explained below his dispute is neither genuine nor material. (*See* Resp. to D-SOF ¶¶ 48–49.)

On these facts, Mr. Bradshaw claims that Dr. Hrishikesan was deliberately indifferent by "ignoring" his request for hepatitis C treatment. (Opp. at 14; *see* AC ¶ 25.)[13]

## II.    **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Put another way, "[s]ummary judgment is designed . . . to assess whether a genuine issue of material fact exists and whether a trial is necessary." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding the existence of a genuine dispute of material fact, the Court views all facts and reasonable inferences in the light most favorable to the nonmovant and asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Fowler v. AT&T Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (quoting *Anderson*, 477 U.S. at 251–52).

If the party seeking summary judgment carries its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for

---

[13] The Court briefly notes, for the sake of completeness and unrelated to his claim about Dr. Hrishikesan's treatment of his hepatitis C, that Mr. Bradshaw brings a final claim about his "venous access issues." (P-SSOF ¶¶ 9–10; Opp. at 15.) He asserts that, because of these issues, medical providers at a prior facility successfully drew his blood from behind his knee rather than from his radial veins, but that "Defendants" have not followed suit. (P-SSOF ¶¶ 9–10; Opp. at 15.) He does not, however, make any specific factual assertions about any of the instant Defendants ever drawing his blood, nor does he cite any record evidence in support of his claims. *But see* Fed. R. Civ. P. 56(c); L. Civ. R. 56.1(a).

summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Turco v. City of Englewood*, 935 F.3d 155, 161 (3d Cir. 2019) (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)). "Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018); *see Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). Likewise, the movant may establish entitlement to judgment as a matter of law by showing that the plaintiff's evidence is insufficient to establish an essential element of his claim. This showing "necessarily renders all other facts immaterial," such that "there can be no genuine issue as to any material fact" for a jury to decide. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

## III.   **DISCUSSION**

Plaintiff brings Eighth Amendment claims against all Defendants. (AC ¶¶ 38–41.) The Eighth Amendment's proscription on the "unnecessary and wanton infliction of pain" encompasses "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see* U.S. Const. amend. VIII. Eighth Amendment medical care claims have two elements: (1) the plaintiff's serious medical need and (2) the defendant's deliberate indifference to that need. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). This dispute centers on the deliberate indifference element. When a plaintiff claims that the medical care he was given was inadequate, rather than that such care was outright denied or delayed, the element of deliberate indifference has both a subjective and an objective prong. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017).

15

All deliberate indifference claims entail the subjective prong: the defendant must have possessed "a 'sufficiently culpable state of mind,'" i.e., "knew of an excessive risk to [the plaintiff's] health or safety and affirmatively disregarded that risk." *Watts v. Herbik*, 364 F. App'x 723, 725 (3d Cir. 2010) (per curiam) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). "It is obduracy and wantonness, not inadvertence or error in good faith," that amount to cruel and unusual punishment in violation of the Eighth Amendment. *Pearson*, 850 F.3d at 539 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *see Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) ("Deliberate indifference is a subjective standard of liability consistent with recklessness as that term is defined in criminal law." (internal quotation marks omitted)). This subjective state of mind, "like any other form of scienter," may be proven "through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 535.

The objective prong of deliberate indifference marks the "critical distinction" between Eighth Amendment adequacy of care claims and denial or delay of care claims. *Id.* When an incarcerated person receives some medical care, courts presume the care was adequate, and a plaintiff can only overcome this presumption with evidence that the defendant's particular treatment "fell below a professional standard of care." *Id.* at 536. It is insufficient for a plaintiff to merely disagree with a physician's exercise of professional judgment as to the proper course of treatment. *Id.* at 535; *see Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017) ("Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." (omission in original) (cleaned up) (quoting *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979))). Nor does negligence, mistake, or even medical malpractice constitute deliberate indifference. *See*

*Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016); *Palakovic*, 854 F.3d at 228 ("[F]ederal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."); *accord Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) ("Ordinary individuals outside a prison's walls and inmates within those walls both face a risk that their doctors will perform incompetently. That is why the states have adopted a well-established body of tort law to remedy the harms caused by medical malpractice. But mere malpractice does not violate the Eighth Amendment.").

Thus, to satisfy the adequacy of care element of the deliberate indifference prong, extrinsic evidence "regarding the quality of [a plaintiff's] medical care"—often medical expert testimony—is necessary unless it would be "obvious to a layperson" that the treatment at issue was inadequate. *Pearson*, 850 F.3d at 536. "[E]valuating whether medical treatment is adequate presents an objective question typically beyond the competence of a non-medical professional." *Id.*

For the reasons soon set forth, the absence of medical expert testimony here means Mr. Bradshaw cannot create a genuine issue of material fact as to most if not all of his claims. The Court notes at the outset that this absence may well reflect the strength of Plaintiff's claims and not that of his representation. Indeed, as further explained below, it is far from clear on the record before the Court that an expert witness could have been obtained who would testify that any of the extensive treatment at issue was substandard. *Cf. Hubert v. Luscavage*, No. 21-1523, 2024 WL 310201, at *22 (M.D. Pa. Jan. 26, 2024) (explaining that courts "frequently reject[]" Eighth Amendment claims of inadequate medical care, "particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services," and describing the deliberate indifference standard as "exacting").

A.    MENTAL HEALTH AND PAIN TREATMENT

The Court begins with Mr. Bradshaw's claims that Dr. Leonard was deliberately indifferent in prescribing Trazodone and failing to wean him off Effexor, that Dr. Nwachukwu was deliberately indifferent in not renewing his Celebrex prescription, and that Drs. Nwachukwu, Hrishikesan, and Senyumba were deliberately indifferent in not ordering a lumbar spine MRI and not doing more to treat his back pain. These claims all fail for the same reason: Mr. Bradshaw takes issue with the course of treatment chosen by medical professionals, yet "has provided no extrinsic evidence that would permit a layperson to conclude that [Defendants'] actions constituted 'a substantial departure from accepted professional judgment, practice, or standards.'" *Id.* at 542 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).

It is undisputed that Defendants provided ongoing treatment for Mr. Bradshaw's various medical needs. As explained, "when medical care is provided, [courts] presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id.* at 535; *see Palakovic*, 854 F.3d at 227–28 ("Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."). Indeed, it is well established that an incarcerated person's "mere disagreement" with his physician's medical decisions "does not create an actionable constitutional violation." *Romero v. Ahsan*, 827 F. App'x 222, 227 (3d Cir. 2020) (per curiam); *see James v. Pa. Dep't of Corr.*, 230 F. App'x 195, 197 (3d Cir. 2007) (per curiam) ("Although [Plaintiff] may have preferred a different course of treatment, his preference alone cannot establish deliberate indifference[,] as such second-guessing is not the province of the courts."). This includes disagreement with a physician's decisions about what diagnostic tests are called for, what medications to prescribe or discontinue, and how to do so. *See*

*Estelle*, 429 U.S. at 107; *Wisniewski v. Frommer*, No. 16-1626, 2017 WL 9534006, at \*5–6 (M.D. Pa. July 28, 2017) ("[I]nmate disputes with medical professionals over prescription and medications – including the suspension of prescriptions, or the substitution of medications – will generally not state a claim under the Eighth Amendment."), *report and recommendation adopted*, 2017 WL 3770493 (M.D. Pa. Aug. 31, 2017), *aff'd*, 751 F. App'x 192 (3d Cir. 2018).

Medication decisions plainly involve complex considerations and require medical expertise—a reality that is underscored by Dr. Leonard's testimony about the sorts of considerations he weighs when prescribing medications to patients, including to Mr. Bradshaw. (Dr. Leonard Dep. 20:1–14 (testifying that he reviews medications a patient has taken in the past in order to see how the patient responded to specific medications and "categories of medications," including "if they had success with a particular type of medication" or "had difficulty with a medication," and that he considers "some of the reasons they might not've done well with a particular medication"); *id.* 23:11–15 (testifying that he prescribed only non-benzodiazepines and non-addictive medications to Mr. Bradshaw and "tr[ied] to work with his symptomatology" when prescribing medications).)

For a layperson on a jury to reasonably conclude that Defendants violated professional standards by prescribing a given medication despite possible side effects or interaction potential, discontinuing a medication without tapering the dosage, choosing one medication over another to treat pain, or ordering an MRI of one part of the spine but not another, Mr. Bradshaw would have to present expert testimony or other extrinsic evidence on what would constitute adequate care in those contexts or how Defendants can be said to have deviated. *See Pearson*, 850 F.3d at 536 ("[M]edical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular

treatment or diagnosis fell below a professional standard of care."). He has not done so. Even after several years of discovery and multiple scheduling order adjournments, Mr. Bradshaw identified no experts who could testify at trial that Defendants provided substandard care or failed to exercise medical judgment. This may not be for lack of consideration or contemplation—the Court will not engage in conjecture, but Defendants' robust treatment of Mr. Bradshaw suggests a steep uphill battle to identify a supportive medical expert witness. *See Hubert*, 2024 WL 310201, at *22; *cf. Moore v. Rossino*, No. 14-870, 2018 WL 1127732, at *3 (W.D. Pa. Mar. 2, 2018) ("[Plaintiff's expert's] report falls woefully short of supplying specific evidence that the actions [the defendant doctor] took at any particular point fell so short of the standard of care expected by a family practitioner that they not only violated the professional standards governing such community care, but were egregious enough to permit a finding that they amounted to the type of wantonness that will constitute a form of cruel and unusual punishment."), *aff'd sub nom.*, *Moore v. Luffey*, 767 F. App'x 335, 341 (3d Cir. 2019) ("Neither the treating specialist nor [plaintiff's] expert indicated that [the defendant doctor's] course of action fell so far below the requirements of competent, professional medical care as to allow a jury to find that it was motivated by non-medical factors."). Other forms of extrinsic proof regarding the quality of medical care may also suffice, including medical records that would allow a reasonable jury to find that Defendants provided inadequate care. *See Pearson*, 850 F.3d at 536. However, Mr. Bradshaw's medical records, described at length above, do not reasonably support that conclusion, nor does Mr. Bradshaw contend that they do.[14]

---

[14] Defendants submitted 152 pages of Mr. Bradshaw's medical records in support of their Motion, *see supra* note 4 (citing Med. Rec.), in addition to 15 pages attached to Dr. Hrishikesan's deposition transcript, (*see* 158-4 at 83–94, 101, 103–104). Mr. Bradshaw did not supplement the excerpted record with any additional pages and, more importantly, cites a total of two pages therein in his opposition briefing. (*See* P-SSOF ¶¶ 15–17 (citing Med. Rec. at D2841, D5061); Resp. to D-SSOF (no citations to medical record); Opp. (no citations to medical record).) Mr. Bradshaw's assertions are incorporated in the factual background section, *supra*, and considered by the Court and do not move the needle on Mr. Bradshaw's claims.

Mr. Bradshaw instead relies primarily on his own deposition testimony. Such evidence is relevant to his allegations about how individual defendants acted toward him and could certainly allow a reasonable jury to agree that he subjectively found his treatment inadequate. For example, Mr. Bradshaw testified that he continued to be given Effexor and Buspar while also taking Trazodone. (Pl. Dep. 51:1–7.) For purposes of the subject motion, the Court accepts that personal experience testimony as true, although it does not bear on whether Dr. Leonard nonetheless ordered the discontinuation of those prescriptions during that time.[15] Nor would it create a triable issue of fact on the issue of deliberate indifference, even assuming, *arguendo*, that Dr. Leonard did not order that discontinuation, given the absence of extrinsic evidence that prescribing the three altogether violates professional standards of care, let alone evidence that Dr. Leonard subjectively appreciated and disregarded a serious risk of harm.

Mr. Bradshaw similarly relies on his deposition testimony with respect to his allegations about Defendants' treatment of his pain, asserting that he "cannot recall ever having a

---

[15] Defendants, citing the relevant chart note in Mr. Bradshaw's medical records, say Dr. Leonard ordered the discontinuation of Buspar and Effexor the same day he prescribed Trazodone. (D-SOF ¶ 5 (citing Med. Rec. at D2917).) Mr. Bradshaw denies that statement of fact—but does so in a procedurally improper manner that, under this District's Local Civil Rules, makes Defendants' statement undisputed. (*Compare* Resp. to D-SOF ¶ 5 (merely responding "Denied" to Defendants' corresponding statement of fact)), *with* L. Civ. R. 56.1(a) (requiring a summary judgment opponent to file "a responsive statement of material facts . . . stating each material fact in dispute and *citing to the affidavits and other documents submitted in connection with the motion*" and specifying that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion" (emphasis added)).

The Court ignores Plaintiff's procedural deficiency for the moment and excavates the source of Mr. Bradshaw's denial. *Cf. United States v. Morton*, 993 F.3d 198, 204 n.10 (3d Cir. 2021) ("Judges are not like pigs, hunting for truffles buried in the record."). Mr. Bradshaw testified that neither Buspar nor Effexor were discontinued when he started Trazodone, which he apparently or impliedly concluded from the fact that he continued being given all three medications until Trazodone was discontinued a week later. (Pl. Dep. 51:1–7.) However, Plaintiff nowhere suggests—not in his deposition, briefing, or with reference to any evidence—that Dr. Leonard knew or intended that he continue taking all three medications. Thus, Mr. Bradshaw's continued receipt of all three medications does not genuinely dispute that Dr. Leonard ordered the discontinuation of Buspar and Effexor. *See Johnson v. USANA Health Scis., Inc.*, 632 F. Supp. 3d 1245, 1250 n.23 (D. Utah 2022) ("The court finds these claims are not mutually exclusive, and therefore the fact is not genuinely in dispute.").

conversation" about "Celebrex's heart health side effects" such that the medication's non-renewal constituted inadequate care under the Eighth Amendment.[16] (Opp. at 13 (citing Pl. Dep. 75:4–9).) This despite Mr. Bradshaw expressly conceding the opposite in response to Defendants' SOF, *see supra* note 8, not to mention testifying to the contrary, (Pl. Dep. 74:15–75:3; *see also id.* 89:2–16). However, Mr. Bradshaw's non-recollection of any such conversations does not genuinely dispute that they occurred. Nor is such a dispute material, even if genuine: A failure to explain side effects does not amount to deliberate indifference. *Bryant v. Kaskie*, 744 F. App'x 39, 42 (3d Cir. 2018) (per curiam) ("[Defendant's] alleged failure to inform [Plaintiff] of the potential side effects of Risperidone is insufficient to demonstrate deliberate indifference. Even if this allegation could rise to the level of negligence, simple negligence cannot support an Eighth Amendment claim."). It also has no bearing on the more relevant question of whether Mr. Bradshaw's providers nonetheless considered such side effects in making medical decisions, and, again, Defendants offer citations to the record to show that they did. (D-SOF ¶¶ 4, 29, 31, 47.)

Mr. Bradshaw also points to Dr. Leonard's deposition testimony in an attempt to create a genuine issue of fact on his claims against the mental health provider. He insists that no additional extrinsic evidence is needed for a reasonable jury to find Dr. Leonard deliberately indifferent because Dr. Leonard himself testified that he knew about the "severe" and "likely" risks associated with taking Trazadone, Effexor, and Buspar concurrently and not tapering off Effexor. (*See* Resp. to D-SOF ¶¶ 4, 9, 10; Opp. at 10–12.) However, that is an overstatement and mischaracterization

---

[16] Mr. Bradshaw appears to contend that Celebrex should have been further renewed as it had been at prior facilities notwithstanding the side effects or risks associated. "[N]o actionable claim arises 'when a doctor disagrees with the professional judgment of another doctor,' because '[t]here may . . . be several acceptable ways to treat an illness.'" *Romero*, 827 F. App'x at 227 (second alteration and omission in original) (emphasis omitted) (quoting *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990)). This claim is in some ways the inverse of his claim about Trazadone, which Mr. Bradshaw says should *not* have been provided based on his personal assessment of the risks. It is these professional judgment calls that are presumed adequate under the Eighth Amendment.

of Dr. Leonard's testimony. With respect to taking the three medications together, Dr. Leonard testified that "there is a serotonin syndrome that can occur. It's rare, but it is a potential. And with that, there can be elevations in the blood pressure and cardiac effects from that." (Dr. Leonard Dep. 9:22–25.) Dr. Leonard nowhere testified, contrary to what Mr. Bradshaw contends, that any adverse reaction was "likely." (Opp. at 10.) He agreed that elevated blood pressure is a "more typical" reaction than "severe swelling in the limbs," but he was not specific; he did not say the degree, seriousness, or likelihood of this blood pressure increase. (Dr. Leonard Dep. 25:2–15.)

With respect to not tapering off Effexor, Dr. Leonard testified simply that "there is a discontinuation syndrome which is uncomfortable to the patient. So that's why I slowly taper off [as a general practice]." (*Id.* 28:3–5.) When asked whether "abrupt withdrawal symptoms from Effexor can be fatal," Dr. Leonard said that he was "not aware of any fatalities from that," (*id.* 28:11–15)—contrary to Mr. Bradshaw's unsupported assertion to the contrary, (Resp. to D-SOF ¶ 10 ("Mr. Bradshaw . . . requested to be weaned off of Effexor because abrupt discontinuation causes serious, sometimes fatal withdrawal symptoms.")). Dr. Leonard's deposition testimony further supports that he saw Mr. Bradshaw's tapering request as moot after Mr. Bradshaw took matters into his own hands. (*See* Dr. Leonard Dep. 28:1–10; *see also* Med. Rec. at D5061 (portal message from clinic staff to Mr. Bradshaw that "Dr. Leonard discontinued the [E]ffexor on 3/5/18 because you were refusing to take it. . . . He said he is trying to get some medical input – to see if there is anything more that can be done.").) In short, while a treating physician's deposition testimony could, on different facts, theoretically allow a reasonable jury to conclude that the physician deviated from professional standards of care, altogether failed to exercise professional

judgment, or recklessly disregarded a substantial risk of serious harm, Dr. Leonard's testimony does not permit that conclusion. *Cf. Pearson*, 850 F.3d at 536.[17]

With respect to Mr. Bradshaw's claims that Drs. Nwachukwu, Hrishikesan, and Senyumba were deliberately indifferent because they did not order a lumbar spine MRI, the Court reiterates that "[a] medical decision not to order specific diagnostic tests is 'a classic example of a matter for medical judgment,' and cannot form the basis for a claim of deliberate indifference." *Davidson v. Corr. Med. Servs., Inc.*, No. 08-3580, 2010 WL 324449, at *11 (D.N.J. Jan. 19, 2010) (quoting *Estelle*, 429 U.S. at 107). While the Court accepts as true Mr. Bradshaw's statements that he experienced "intense" lower back pain in August 2018, (Pl. Dep. 81:9), it cannot do the same with respect to his personal opinion that a lower spine MRI was medically necessary or that Defendants were deliberately indifferent in failing to order one, *see, e.g.*, *Abdul-Aziz v. Lynch*, No. 20-10265, 2025 WL 3171257, at *3 (D.N.J. Nov. 13, 2025). The undisputed evidence shows that Defendants provided various forms of treatment for Mr. Bradshaw's pain. He received Celebrex (prescribed by a non-party and approved by Dr. Nwachukwu) from January 2017 until early April 2018; Dr. Hrishikesan increased his Motrin dosage during his June 27, 2018 appointment; and Dr. Senyumba prescribed Tylenol during his August 8, 2018 appointment. He received imaging tests, including

---

[17] Mr. Bradshaw also suggests that the symptoms he experienced—swelling and high blood pressure on October 16, 2017, and headaches and stomach cramps for two weeks between February and March 2018—evince Dr. Leonard's deliberate indifference. (Opp. at 10–12.) Even assuming that the former was in fact caused by Trazodone and the latter was indeed a result of withdrawal from Effexor, this evidence is insufficient to support Mr. Bradshaw's claim, and even cuts against it. Again, erroneous medical decisions and medical malpractice do not, without more, amount to cruel and unusual punishment. *See Parkell*, 833 F.3d at 337. Moreover, it is undisputed that Mr. Bradshaw's October 16 reaction was promptly and effectively treated, including because Dr. Leonard discontinued Trazodone the very next day and at no point thereafter prescribed it for Mr. Bradshaw. So, too, Mr. Bradshaw's Effexor withdrawal symptoms align with what Dr. Leonard testified was possible with abrupt discontinuation of the medication—"a discontinuation syndrome which is uncomfortable"—in contrast to the "fatalities" Mr. Bradshaw insists was possible, thus underscoring why a plaintiff's personal opinion on medical issues is insufficient in these cases. (Dr. Leonard Dep. 28:3–5.)

not only the August cervical spine MRI he says was mistaken but also X-rays of his left shoulder, hip, and hand. Mr. Bradshaw believes a lumbar spine MRI was a necessary next step to assessing and treating his back pain but provides no extrinsic evidence from which a reasonable jury could conclude that Defendants violated professional standards by providing a different course of treatment. *Cf. Jones v. N.J. DOC Cent. Transp.*, No. 18-1454, 2024 WL 1173219, at *11 (D.N.J. Mar. 19, 2024) ("[A] decision to prescribe nonnarcotic medications, such as Motrin or Tylenol, despite an inmate's request for stronger pain medication is a disagreement concerning treatment and not deliberate indifference.").

Mr. Bradshaw's claimed intense lower back pain, while regrettable, does not obviate the need for extrinsic evidence. The Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976), helps explain why. *Accord Phillips*, 14 F.4th at 537 ("A comparison of this case's facts with those in the Supreme Court's *Estelle* decision shows how far short Phillips's claim falls."). There, an incarcerated plaintiff sought treatment for his back pain seventeen times in three months after a bale of cotton fell on him, and he was given only bed rest, pain medication, and muscle relaxers as treatment. *Estelle*, 429 U.S. at 99, 107. He claimed his care was constitutionally inadequate because, *inter alia*, he had not been given an X-ray or indeed any diagnostic test to diagnose and appropriately treat "the daily pain and suffering he was experiencing"—but the Supreme Court rejected his claim at the pleading stage. *Id.* at 107. It disagreed with the lower court's statement that "[c]ertainly an x-ray of [Plaintiff's] lower back might have been in order" and reasoned that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under [state tort law]." *Id.*

Here, unlike in *Estelle*, the doctors ordered numerous diagnostic tests. Whether and what more to do for Mr. Bradshaw, including whether to order a lower-spine MRI, "is a classic example of a matter for medical judgment," *id.*, and it would not be obvious to a layperson on a jury that Defendants' decisions were objectively improper, *see Cowher v. Pike Cnty. Corr. Facility*, No. 16-2259, 2019 WL 3302415, at *15 (M.D. Pa. July 23, 2019) ("[T]he course of treatment for a cervical spine and bulging disc issue would not be obvious to a lay person."); *cf. Pearson*, 850 F.3d at 537 ("A layperson is capable of concluding that forcing a screaming patient to crawl to a wheelchair violates professional standards of care."); *Natale*, 318 F.3d at 582–83 ("A reasonable jury could conclude that [defendants] knew that [plaintiff] was an insulin-dependent diabetic and that if insulin was not administered as required, he would suffer adverse health consequences."). Without additional extrinsic evidence that would allow a reasonable jury to draw that conclusion, Mr. Bradshaw's claim fails.

The Court further notes that, although Mr. Bradshaw insists his receipt of the upper-spine MRI was a mistake because he instead needed a lower-spine MRI, mistakes are not actionable under the Eighth Amendment. *See Rouse*, 182 F.3d at 197. What is more, the MRI indeed showed "[m]ultilevel degenerative changes" throughout his cervical spine, thus further illustrating why courts defer to medical providers in their exercise of professional judgment. (Med. Rec. at D166.)[18]

---

[18] In contrast, Mr. Bradshaw does not say what the lumbar spine MRI showed when he received it "years later." (P-SSOF ¶ 8.) For many reasons, his eventual receipt of that MRI does not itself support his claim that it was deliberate indifference to instead receive a cervical spine MRI during the at-issue period. *See, e.g., McGinnis v. Hammer*, 751 F. App'x 287, 292 (3d Cir. 2018) (per curiam) ("McGinnis has failed to allege how his treatment fell below any professional standard of care. To the extent McGinnis alleges that he should have received x-rays or an MRI sooner, he eventually received both tests, and has not alleged

## B.    HEPATITIS C TREATMENT

Dr. Hrishikesan is also entitled to summary judgment on Mr. Bradshaw's claim that she inadequately treated his hepatitis C, as he has not submitted evidence that would allow a reasonable jury to conclude that her treatment breached professional standards of care or was done with a sufficiently culpable state of mind.

As above discussed, Mr. Bradshaw agrees that he had an appointment with Dr. Hrishikesan on June 27, 2018, after two April 2018 appointments focused on his lower leg swelling and blood pressure. (Resp. to D-SOF ¶¶ 37, 42, 46.) The medical record for that appointment included Dr. Hrishikesan's narrative chart note and the various labs, tests, and consults she was ordering, among other details. (Med. Rec. at D178–D187.) In her chart note, she wrote the heading "Hepatitis C," then noted that Mr. Bradshaw requested treatment, that she was ordering an infectious disease consult, and that Mr. Bradshaw's "APRI score" was "low." (*Id.* at D182; *see id.* at D179 (recording Mr. Bradshaw's "APRI," i.e., "AST to Platelet Ratio Index").) In turn, the list of "Labs, Consults, . . . Referrals, etc." associated with the appointment included an "Infectious Disease Consult." (*Id.* at D185.) Dr. Hrishikesan likewise testified that she ordered an infectious disease consult for Mr. Bradshaw. (Dr. Hrishikesan Dep. 17:9–18, 30:23–31:3.) Finally, the ordered tests included "Hepatitis C Viral Load with Graph." (Med. Rec. at D187.)

In response, Mr. Bradshaw cites his deposition testimony that he "do[es]n't recall having any discussion about any of this" with Dr. Hrishikesan during his June 27 appointment, that Dr.

---

that those tests indicated that any additional or alternative treatment was required."). Nor would it help to construe Mr. Bradshaw as bringing a delayed care rather than inadequate care claim, as he has not presented evidence that any delay was due to non-medical reasons or any conduct by Defendants. *See id.* at 291 (explaining that deliberate indifference has been found when "necessary medical treatment is delayed for non-medical reasons" or "knowledge of the need for medical care is accompanied by the intentional refusal to provide it"); *see also id.* ("[There is] no denial of care claim where defendant diagnosed and treated prisoner, even if inadequately—in which case [the] proper claim would be for inadequate care . . . .").

Hrishikesan "didn't discuss [his] Hepatitis score with [him]," that he "ha[s]n't had a viral load done in 15 years," and that he "never had a consult" with an infectious disease doctor. (Pl. Dep. 105:4–5, 105:14–15, 106:3–4; *see* Resp. to D-SOF ¶¶ 48–49.) None of these assertions suffice to create a material issue of fact as to the adequacy of Dr. Hrishikesan's treatment of Mr. Bradshaw.

First, for the reasons already explained, Mr. Bradshaw's inability to recall a discussion with Dr. Hrishikesan about his APRI score or the test or consultation she was ordering does not genuinely dispute that such a discussion occurred. Nor is the non-occurrence of such a conversation—assuming, *arguendo*, it did not happen—material, as it does not amount to deliberate indifference for a medical provider to not discuss a test result or intended course of action with a patient. *See, e.g.*, *Maqbool v. Univ. Hosp. of Med. & Dentistry of N.J.*, No. 11-4592, 2012 WL 2374689, at *9 (D.N.J. June 13, 2012) ("[R]efusal . . . to explain to the inmate the reason for medical action or inaction . . . cannot amount to cruel and unusual punishment."). The relevant question is whether Mr. Bradshaw was given adequate treatment for his hepatitis C by Dr. Hrishikesan, not whether she recounted her treatment decisions to him. The occurrence or non-occurrence of such a conversation also does not bear on the actual orders placed by Dr. Hrishikesan or the results of Mr. Bradshaw's tests, as Mr. Bradshaw himself appears to recognize. (*See, e.g.*, Pl. Dep. 93:5–9 ("Q. Do you know if there were any readings on your Hepatitis C? A. Well, probably yes . . . but I don't remember."); *id.* 105:4–10 ("I don't recall any discussion about any of this. Now, as I said, we talk, and she might ask me something, and she may infer something from what I said or what I report. In other words, she doesn't tell me, well, I'm going to put in a consult . . . ."); *see also id.* 103:13–22 ("Q. And then a little bit further down she says that hypertension is stable on the Coreg and [Hydrochlorothiazide], and that your echo is normal, is that correct? A. If that's what she says, yes. Q. And do you recall that to be true at the time? A. I

don't know, because as I said, she doesn't necessarily tell me these things, we don't discuss it.").) It is thus not genuinely disputed—and is supported by the medical records and deposition testimony Defendants cite—that Mr. Bradshaw's APRI score was low and that Dr. Hrishikesan ordered an infectious disease consult plus further hepatitis C testing, including a viral load test.

Whether the tests and consult actually happened is a distinct question. Mr. Bradshaw's deposition testimony supports that they did not. (*See* D-SOF ¶¶ 48–49 (citing Pl. Dep. 105:13–14, 106:2–4).) However, Mr. Bradshaw does not present evidence that Dr. Hrishikesan was personally responsible for her ordered care not occurring, or that any non-fulfillment of those orders resulted from *her*, as opposed to someone else's, deliberate indifference. *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018) ("[I]n the face of motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial."); *see also Kaneakua v. Derr*, No. 22-201, 2025 WL 3443643, at *5–6 (D. Haw. Dec. 1, 2025) (granting summary judgment in defendant doctor's favor on adequacy-of-care claim where defendant first ordered ENT consult in March 2021, re-ordered consult during January 2022 follow-up appointment after consult had not yet been given, and eventually ordered "urgent" consultation in July 2022 based on escalated symptoms, and reasoning that "[a]lthough [plaintiff] might believe that he should have seen an ENT doctor sooner, this does not demonstrate deliberate indifference *by Dr. Kwon*"); *cf. Maxwell v. Singh*, No. 05-4379, 2007 WL 9728931, at *8 (C.D. Cal. Dec. 3, 2007) (granting summary judgment in defendant doctor's favor on delay of care claim and reasoning that "there is no

evidence in the record that Dr. Singh was responsible for ensuring that plaintiff, once he was referred to a specialist, actually saw that specialist").[19]

Mr. Bradshaw equally fails to create a genuine dispute of material fact as to the adequacy of Dr. Hrishikesan's course of treatment of responding to his low APRI score by ordering a hepatitis C viral load test and infectious disease consult. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."). While it is undisputed that Mr. Bradshaw had a history of hepatitis C, a lay person on a jury would need extrinsic evidence, not here presented by Mr. Bradshaw, to assess whether Dr. Hrishikesan's treatment fell within the bounds of professional standards of care. *See Pearson*, 850 F.3d at 539 ("Without extrinsic evidence showing that a failing gall bladder is emergent or necessitates some other response, no layperson would be able to find that Nurse Kline's determination that Pearson should rest until his examination in the morning was 'a substantial departure from accepted professional judgment, practice, or standards.'"); *Davis v. Wetzel*, No. 18-804, 2021 WL 6072698, at *15 (M.D. Pa. Dec. 23, 2021) ("[Plaintiff] has not provided any extrinsic evidence to show the course of treatment was improper, and the course of treatment for Hepatitis C would not be obvious to a lay person." (citing *Jackson v. Ivens*, 565 F. App'x 115, 118 (3d Cir. 2014) (per curiam))).

For example, it is unclear to the Court, as it would be to a jury, whether and how Mr. Bradshaw's APRI score, as opposed to his viral load, provides insight into his need for further treatment for hepatitis C, and he points to nothing suggesting an obvious need for immediate action. *Cf. Palmer v. Carroll*, 640 F. Supp. 2d 542, 545 (D. Del. 2009) (noting that hepatitis C

---

[19] The Court again notes that Dr. Hrishikesan worked at NJSP for approximately nine months. (D-SOF ¶ 36; Resp. to D-SOF ¶ 36.)

virus "ranges in severity from a mild illness lasting a few months to a serious, lifelong illness that attacks the liver" such that testing positive for hepatitis C at some point does not indicate active illness or symptoms at present); *Bush v. Doe (I)*, 858 F. App'x 520, 521–23 (3d Cir. 2021) (finding delay-of-care claim related to hepatitis C treatment adequately pled where plaintiff "could barely get out of bed" and was informed "his Hep C levels were so high that he needed immediate treatment" but was "simply monitor[ed]" and put on a "treatment waiting list" allegedly due to costs of treatment). Likewise, even assuming, *arguendo*, Dr. Hrishikesan did provide inadequate care for Mr. Bradshaw's hepatitis C, "a reasonable jury could not conclude she was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed' and that she 'also drew the inference.'" *Pearson*, 850 F.3d at 540 (cleaned up) (quoting *Farmer*, 511 U.S. at 837); *see id.* at 535 ("[T]he mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care.").

## C.    BLOOD PRESSURE AND RELATED TREATMENT (WAIVED CLAIMS)

Mr. Bradshaw otherwise claims that Dr. Hrishikesan inadequately treated his stenosis and the swelling in his legs and that Dr. Senyumba was deliberately indifferent by failing to order or delaying his prescription of Xarelto. These claims are underdeveloped and, to the extent they are not waived, fail as a matter of law.

First, Mr. Bradshaw appears to abandon his claim that Dr. Hrishikesan inadequately treated his stenosis and the swelling in his legs, as he does not dispute any of Defendants' relevant factual statements. (*See* Resp. to D-SOF ¶¶ 36–45 (admitting the relevant facts as stated by Defendants and denying only a minor, immaterial detail).) In his response to Defendants' properly supported summary judgment motion, which further demonstrates the absence of any triable fact issue on the

subject, Mr. Bradshaw makes the lone, conclusory statement that Dr. Hrishikesan "fail[ed] to provide any necessary medication or treatment for [his] stenosis despite multiple visits related thereto," then develops the argument no further. (Opp. at 14.) With only this bare assertion, his stenosis claims are waived. *Haagensen v. Pa. State Police*, 490 F. App'x 447, 455 n.12 (3d Cir. 2012) ("[A]n argument consisting of no more than a conclusory assertion . . . (without even a citation to the record) will be deemed waived." (alteration and omission in original) (quoting *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997))); *see Prince v. Pajela*, No. 22-1939, 2023 WL 3481464, at *5 (D.N.J. May 16, 2023) ("It is not enough for a party to mention a possible argument in the most skeletal way and leave the court to put flesh on its bones." (quoting *Brenay v. Schartow*, 709 F. App'x 331, 336–37 (6th Cir. 2017))).

Out of an abundance of caution, the Court briefly notes that any Eighth Amendment claim on this issue is belied by the undisputed record, detailed above, which demonstrates Dr. Hrishikesan's extensive and effective treatment of Mr. Bradshaw's leg swelling and stenosis. Dr. Hrishikesan first saw Mr. Bradshaw for lower leg swelling in April 2017. (D-SOF ¶ 37; Resp. to D-SOF ¶ 37; Dr. Hrishikesan Dep. 13:6–20.) She adjusted his medications in such a way that, by Mr. Bradshaw's own admission, effectively resolved the swelling. (D-SOF ¶¶ 38, 42–43; Resp. to D-SOF ¶¶ 38, 42–43.) At that initial appointment, she also ordered an outside cardiology consult, which Mr. Bradshaw had about three months later, and multiple tests, including an EKG and echocardiogram, both of which Mr. Bradshaw shortly received. (D-SOF ¶¶ 39–41, 50; Resp. to D-SOF ¶¶ 39–41, 50.) Dr. Hrishikesan also had two follow-up appointments with Mr. Bradshaw in between her first April 4, 2018, appointment with him and his outside cardiology appointment on July 11, 2018. (D-SOF ¶¶ 42, 46; Resp. to D-SOF ¶¶ 42, 36.) One follow-up appointment was on April 18, only fourteen days after the initial appointment. (D-SOF ¶ 42; Resp. to D-SOF ¶ 42.) Dr.

32

Hrishikesan continued to monitor Plaintiff's symptoms, refill his blood pressure medications, and secure further testing. (D-SOF ¶¶ 43–45; Resp. to D-SOF ¶¶ 43–45.) Mr. Bradshaw presents no evidence, let alone argumentation, that any of this extensive treatment was inadequate.

Mr. Bradshaw similarly asserts that Dr. Senyumba "ignor[ed]" the outside cardiologist's recommendation that he receive Xarelto and a venous ultrasound, but he develops the argument no further, focusing only on Dr. Senyumba's treatment of his lower back pain discussed hereinabove (and even then offering only three sentences on the subject). (Opp. at 15.) He does not dispute Defendants' two factual statements about the venous ultrasound—that it was prescribed by the outside cardiologist on February 22, 2019, and *shortly received* by Mr. Bradshaw on March 26, 2019—and makes no additional factual allegations, including none about any involvement Dr. Senyumba had in relation to the venous ultrasound. (D-SOF ¶¶ 73–74; Resp. to D-SOF ¶¶ 73–74.) Any claim about the venous ultrasound is clearly waived, and equally deficient. *See Haagensen*, 490 F. App'x at 455 n.12.

As for Xarelto, Mr. Bradshaw disputes none of the following factual statements by Defendants. Xarelto was recommended during Mr. Bradshaw's third appointment with the outside cardiologist on February 22, 2019. (D-SOF ¶¶ 56, 59; Resp. to D-SOF ¶¶ 56, 59.) Within a matter of days, the recommendation was approved (by Dr. Nwachukwu) and Xarelto was prescribed and added to Mr. Bradshaw's medication list. (D-SOF ¶¶ 60–62; Resp. to D-SOF ¶¶ 60–62.) On May 22, 2019, the cardiologist recommended three months of Xarelto. (D-SOF ¶ 64; Resp. to D-SOF ¶ 64.) Two days later, Xarelto was prescribed by a non-party physician and continued to be approved, prescribed, and secured by non-party NJSP physicians until October 1, 2020, when it was discontinued by the outside cardiologist. (D-SOF ¶¶ 64–65, 67–71; Resp. to D-SOF ¶¶ 64–65, 67–71.) Mr. Bradshaw does not suggest that Dr. Senyumba had any involvement in the ultimate

33

discontinuation of Xarelto. He adds one factual statement that there was a three-to-four-month delay between when the medication was prescribed and when he received it, and he says he only received Xarelto "after Dr. Senyumba was reminded of the prescription during a Telemed appointment." (P-SSOF ¶ 7 (citing Pl. Dep. 34:4–13).)

It is unclear on these undisputed facts, and indeed without the aid of any argumentation by Mr. Bradshaw, (*see* Opp. at 15), how Mr. Bradshaw's delay allegation fits in.[20] More importantly, Mr. Bradshaw presents no evidence of Dr. Senyumba's personal involvement in any delay, even accepting as true his account that he was "having a telemed session, and [Dr. Senyumba] heard the [cardiologist] say, 'I ordered Xarelto for you, but I see they haven't given it to you' and she ran out the room and checked, and oddly, a week or so later I started getting my Xarelto." (Pl. Dep. 34:8–13.) Mr. Bradshaw merely speculates that Dr. Senyumba was "reminded" of the prescription, (P-SSOF ¶ 7), caused it to be provided to him, and thus was also the reason he was not given the medication sooner (rather than that she was simply the reason any delay was resolved). Such conjecture and inferential leap is insufficient to create a triable fact issue as to Dr. Senyumba's personal involvement in any allegedly inadequate care, much less her state of mind in providing

---

[20] It is in fact Defendants who incidentally suggest that there may have been just under three months when Mr. Bradshaw did not receive the Xarelto—between March 1, 2019, when Defendants say a non-party physician discontinued the medication, and March 22, when Mr. Bradshaw had a telemedicine appointment with the cardiologist and he "recommended adding Xarelto for three months." (D-SOF ¶¶ 63–64.) These facts align with Mr. Bradshaw's assertion that he did not receive the medication for around that amount of time until he had a telemedicine appointment with the cardiologist. (P-SSOF ¶ 7 (citing Pl. Dep. 34:3–13).) However, in response to that factual statement by Defendants, Mr. Bradshaw specifically discounts this timeline, asserting that he "was taking Xarelto until October 2020 when Dr. Soffer determined it was no longer necessary"—i.e., that the medication was not discontinued on March 1, 2019, and, seemingly, that there was no delay or gap in his prescription at that time. (Resp. to D-SOF ¶ 63 (citing Pl. Dep. 107:6–14).)

Mr. Bradshaw's treatment.[21] *See Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 179 n.16 (3d Cir.2009) ("[S]peculation alone, without more, is insufficient to survive summary judgment."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts."); *see also Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" (citations omitted)).

In much the same fashion, with respect to Dr. Leonard's treatment of his insomnia, Mr. Bradshaw identifies only one purported factual dispute. Defendants state that "Dr. Leonard and other providers attempted to treat Plaintiff's insomnia by—in addition to the medications discussed above—reducing Plaintiff's day-time naps." (D-SOF ¶ 17 (citing Med. Rec. at D2841, D2849, D2865, D2878, D2880).) In response, Mr. Bradshaw says that he "questions which medications [Defendants' statement] refers to – Trazadone was the only insomnia medication" and that, "[a]s for day-time naps, Dr. Leonard noted that such attempts resulted in 'minimal success.' Reducing day-time naps of course is difficult when Plaintiff cannot sleep at night." (Resp. to D-SOF ¶ 17 (citing Med. Rec. at D2481).) Mr. Bradshaw does not develop this purported dispute via any argumentation in his briefing, asserting only in passing and without specifics that Dr. Leonard

---

[21] Put another way, Mr. Bradshaw's reported observations, at best, are simply that he was not getting Xarelto for several months, Dr. Senyumba overheard his cardiologist inquire about him not getting the medication, she "ran out the room and checked," and within a week he was receiving Xarelto. A reasonable jury could not conclude from that sequence of events that Dr. Senyumba acted with a sufficiently culpable state of mind as required under the Eighth Amendment. *See Baez v. Falor*, 566 F. App'x 155, 158 (3d Cir. 2014) ("Deliberate indifference . . . is an exceedingly high standard . . . 'requir[ing] obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.'" (quoting *Rouse*, 182 F.3d at 197)); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 137 (3d Cir. 2001) ("The deliberate indifference standard as set out in *Farmer* [*v. Brennan*] is a high one, however—requiring actual knowledge or awareness on the part of the defendant . . . .").

"refus[ed] to treat [his] insomnia" then focusing entirely on his Trazodone arguments. (Opp. at 10.) Again, "[i]t is not enough for a party to mention a possible argument in the most skeletal way and leave the court to put flesh on its bones." *Prince*, 2023 WL 3481464, at *5.

Moreover, Mr. Bradshaw's lone factual statement "question[ing] which medications [Defendants' statement] refers to" and noting that, according to Dr. Leonard, "attempts [to reduce day-time naps] resulted in 'minimal success,'" does not present a triable issue of fact as to the adequacy of Dr. Leonard's treatment of his insomnia. (Resp. to D-SOF ¶ 17.) Mr. Bradshaw concedes he received treatment in the form of Trazodone, then expresses dissatisfaction with the outcome of other attempted treatment. The record also shows that, at Mr. Bradshaw's request, Dr. Leonard discontinued Buspar, which Mr. Bradshaw believed to be contributing to his trouble sleeping. (*See* Med. Rec. at D2849, D2861.) Mr. Bradshaw further concedes that he refused to speak with Dr. Leonard during visits that were attempted in March and April 2018, that he soon sought to be removed from the Mental Health Special Needs Roster knowing he would no longer be eligible for treatment from Dr. Leonard, and that he was removed from the Roster at the end of April. (*See* D-SOF ¶¶ 19–24; Resp. to D-SOF ¶¶ 19–24.) While he says his refusals to speak with Dr. Leonard and request for removal from the Roster were responses to "a series of inadequate medical treatment from Dr. Leonard," (Resp. to D-SOF ¶ 19; *see id.* ¶¶ 21–22), he ultimately presents evidence of nothing more than subjective dissatisfaction with Dr. Leonard's treatment, *see McKinney v. Hemsley*, No. 14-3564, 2019 WL 1293719, at *9 (D.N.J. Mar. 20, 2019) ("[N]either a prisoner's personal, subjective dissatisfaction with the care he has been provided, nor

his disagreement with the professional judgment of trained medical staff, in and of itself, is sufficient to establish deliberate indifference.").[22]

### D.    MISCELLANEOUS CLAIMS

Finally, Mr. Bradshaw makes two wholly conclusory and unsupported allegations that "defendants" were deliberately indifferent by drawing his blood from his radial veins, rather than from behind his knee, and by falsifying and/or destroying a medical record. (P-SSOF ¶¶ 10–11; *see* Opp. at 15–16; *see also supra* notes 7, 13.) He makes an equally non-specific, unsupported allegation that "[t]here is a constant delay between Plaintiff's completion of a 30 day supply of medication and the refilling of such medication, sometimes up to three weeks." (P-SSOF ¶ 11; *see* Opp. at 16; *see also supra* note 11.) However, Mr. Bradshaw does not even claim the personal involvement of any of the instant defendants, let alone offer any evidence whatsoever to link his vague and general claims to the named physicians. He also makes no argument for why his falsification or destruction claim is cognizable under the Eighth Amendment. *See, e.g.*, *Johnson v.*

---

[22] Mr. Bradshaw points to his deposition testimony as evidence that "Dr. Leonard reacted to Plaintiff's concerns about the [Trazodone] reaction with dismissive sarcasm." (P-SSOF ¶ 4.) The Court notes that the cited testimony actually concerned Dr. Leonard's reaction to Mr. Bradshaw's concerns about his insomnia. (Pl. Dep. 53:13–16 (testifying that he told Dr. Leonard he was "still having problems with [his] insomnia," to which Dr. Leonard responded, "yeah, I won't prescribe anything, because I'll just have to discontinue that, too").) While this interaction may be relevant to Dr. Leonard's state of mind in treating Mr. Bradshaw's insomnia, it is not alone enough for a reasonable jury to find subjective deliberate indifference, nor does it bear on the adequacy of Dr. Leonard's care. *See Pearson*, 850 F.3d at 542 ("Whether or not Dr. McGrath was angry at being called at home on April 15, Pearson does not dispute that Dr. McGrath prescribed treatment over the phone, ordering observation in the infirmary, antibiotics, and increased intake of fluids."); *id.* at 542 n.7 ("Pearson points to this call as circumstantial evidence of Dr. McGrath's state of mind . . . . While such circumstantial evidence may be relevant to the subjective inquiry, the evidence here is still not sufficient for a reasonable jury to conclude that he had a sufficiently culpable state of mind.").

*Korszniak*, No. 17-3946, 2023 WL 3510892, at *10 (E.D. Pa. May 17, 2023). These claims all plainly fail as a matter of law and are waived.[23] *See Haagensen*, 490 F. App'x at 455 n.12.

---

[23] The Court also incorporates its recent decision dismissing Mr. Bradshaw's blood-draw claim against a different physician defendant, Dr. Haggag. (ECF No. 164.) Notwithstanding Mr. Bradshaw's specific (albeit sparse) allegations that Dr. Haggag ignored Mr. Bradshaw's requests to draw blood from behind his knee, the Court concluded that no claim of inadequate care could survive summary judgment in the absence of extrinsic evidence such as medical expert testimony that it violated professional standards of care to instead draw blood from the radial veins. (*Id.*) Mr. Bradshaw's blood-draw claim here is woefully deficient in comparison to his claim against Dr. Haggag, but the same reasoning applies.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment (ECF No. 155). An appropriate Order accompanies this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: February 5, 2026